

## Office of the Inspector General
U.S. Department of Justice

### OVERSIGHT ★ INTEGRITY ★ GUIDANCE



# A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election

**GOVERNMENT EXHIBIT**

**1**

1:25-CR-272-MSN



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

## Background

In response to requests from Congress, various organizations, and members of the public, the Department of Justice (Department) Office of the Inspector General (OIG) undertook this review of various actions by the Federal Bureau of Investigation (FBI) and the Department in connection with the investigation into former Secretary of State Hillary Clinton's use of a private email server. Our review included examining:

- Allegations that Department or FBI policies or procedures were not followed in connection with, or in actions leading up to or related to, then FBI Director James Comey's public announcement on July 5, 2016, and Comey's letters to Congress on October 28 and November 6, 2016;

- Allegations that certain investigative decisions were based on improper considerations;

- Allegations that then FBI Deputy Director Andrew McCabe should have been recused from participating in certain investigative matters;

- Allegations that the Department's then Assistant Attorney General for Legislative Affairs, Peter Kadzik, improperly disclosed non-public information and/or should have been recused from participating in certain matters;

- Allegations that Department and FBI employees improperly disclosed non-public information during the course of the investigation; and

- Allegations that decisions regarding the timing of the FBI's release of certain Freedom of Information Act (FOIA) documents on October 30 and November 1, 2016, and the use of a Twitter account to publicize this release, were influenced by improper considerations.

During the course of the review, the OIG discovered text messages and instant messages between some FBI employees on the investigative team, conducted using FBI mobile devices and computers, that expressed statements of hostility toward then candidate Donald Trump and statements of support for then candidate Clinton. We also identified messages that expressed opinions that were critical of the conduct and quality of the investigation. We included in our review an assessment of these messages and actions by the FBI employees.

## OIG Methodology

The OIG reviewed significantly more than 1.2 million documents during the review and interviewed more than 100 witnesses, several on more than one occasion. These included former Director Comey, former Attorney General (AG) Loretta Lynch, former Deputy Attorney General (DAG) Sally Yates, FBI agents and supervisors and Department attorneys and supervisors who conducted the investigation, former and current members of the FBI's senior executive leadership, and former President Bill Clinton.

## Conduct of the Midyear Investigation

The FBI and Department referred to the investigation as "Midyear Exam" or "Midyear." The Midyear investigation was opened by the FBI in July 2015 based on a referral from the Office of the Intelligence Community Inspector General (IC IG). The investigation was staffed by prosecutors from the Department's National Security Division (NSD) and the U.S. Attorney's Office for the Eastern District of Virginia (EDVA), and agents and analysts selected primarily from the FBI's Washington Field Office to work at FBI Headquarters.

The Midyear investigation focused on whether Clinton intended to transmit classified information on unclassified systems, knew that information included in unmarked emails was classified, or later became aware that information was classified and failed to report it. The Midyear team employed an investigative strategy that included three primary lines of inquiry: collection and examination of emails that traversed Clinton's servers and other relevant evidence, interviews of relevant witnesses, and analysis of whether classified information was compromised by hostile cyber intrusions.

As described in Chapter Five of our report, we selected for examination particular investigative decisions that were the subject of public or internal controversy. These included the following:

- The preference for consent over compulsory process to obtain evidence;

- Decisions not to obtain or seek to review certain evidence, such as the personal devices used by former Secretary Clinton's senior aides;

- The use of voluntary witness interviews;



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

- Decisions to enter into "letter use" or "Queen for a Day" immunity agreements with three witnesses;

- The use of consent agreements and "act of production" immunity to obtain the laptops used by Clinton's attorneys (Cheryl Mills and Heather Samuelson) to "cull" her personal and work-related emails; and

- The handling of Clinton's interview on July 2, 2016.

With regard to these investigative decisions, we found, as detailed in Chapter Five, that the Midyear team:

- Sought to obtain evidence whenever possible through consent but also used compulsory process, including grand jury subpoenas, search warrants, and 2703(d) orders (court orders for non-content email information) to obtain various evidence. We found that the prosecutors provided justifications for the preference for consent that were supported by Department and FBI policy and practice;

- Conducted voluntary witness interviews to obtain testimony, including from Clinton and her senior aides, and did not require any witnesses to testify before the grand jury. We found that one of the reasons for not using the grand jury for testimony involved concerns about exposing grand jurors to classified information;

- Did not seek to obtain every device, including those of Clinton's senior aides, or the contents of every email account through which a classified email may have traversed. We found that the reasons for not doing so were based on limitations the Midyear team imposed on the investigation's scope, the desire to complete the investigation well before the election, and the belief that the foregone evidence was likely of limited value. We further found that those reasons were, in part, in tension with Comey's response in October 2016 to the discovery of Clinton emails on the laptop of Anthony Weiner, the husband of Clinton's former Deputy Chief of Staff and personal assistant, Huma Abedin;

- Considered but did not seek permission from the Department to review certain highly classified materials that may have included information potentially relevant to the Midyear investigation. The classified appendix to this report describes in more detail the highly classified information, its potential relevance to

the Midyear investigation, the FBI's reasons for not seeking access to it, and our analysis;

- Granted letter use immunity and/or "Queen for a Day" immunity to three witnesses in exchange for their testimony after considering, as provided for in Department policy, the value of the witness's testimony, the witness's relative culpability, and the possibility of a successful prosecution;

- Used consent agreements and "act of production" immunity to obtain the culling laptops used by Mills and Samuelson, in part to avoid the uncertainty and delays of a potential motion to quash any subpoenas or search warrants. We found that these decisions were occurring at a time when Comey and the Midyear team had already concluded that there was likely no prosecutable case and believed it was unlikely the culling laptops would change the outcome of the investigation;

- Asked Clinton what appeared to be appropriate questions and made use of documents to challenge Clinton's testimony and assess her credibility during her interview. We found that, by the date of her interview, the Midyear team and Comey had concluded that the evidence did not support criminal charges (absent a confession or false statement by Clinton during the interview), and that the interview had little effect on the outcome of the investigation; and

- Allowed Mills and Samuelson to attend the Clinton interview as Clinton's counsel, even though they also were fact witnesses, because the Midyear team determined that the only way to exclude them was to subpoena Clinton to testify before the grand jury, an option that we found was not seriously considered. We found no persuasive evidence that Mills's or Samuelson's presence influenced Clinton's interview. Nevertheless, we found the decision to allow them to attend the interview was inconsistent with typical investigative strategy.

For each of these decisions, we analyzed whether there was evidence of improper considerations, including bias, and also whether the justifications offered for the decision were a pretext for improper, but unstated, considerations.

The question we considered was not whether a particular investigative decision was the ideal choice or one that could have been handled more effectively, but



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

whether the circumstances surrounding the decision indicated that it was based on considerations other than the merits of the investigation. If a choice made by the investigative team was among two or more reasonable alternatives, we did not find that it was improper even if we believed that an alternative decision would have been more effective.

Thus, a determination by the OIG that a decision was not unreasonable does not mean that the OIG has endorsed the decision or concluded that the decision was the most effective among the options considered. We took this approach because our role as an OIG is not to second-guess valid discretionary judgments made during the course of an investigation, and this approach is consistent with the OIG's handling of such questions in past reviews.

In undertaking our analysis, our task was made significantly more difficult because of text and instant messages exchanged on FBI devices and systems by five FBI employees involved in the Midyear investigation. These messages reflected political opinions in support of former Secretary Clinton and against her then political opponent, Donald Trump. Some of these text messages and instant messages mixed political commentary with discussions about the Midyear investigation, and raised concerns that political bias may have impacted investigative decisions.

In particular, we were concerned about text messages exchanged by FBI Deputy Assistant Director Peter Strzok and Lisa Page, Special Counsel to the Deputy Director, that potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations. As we describe in Chapter Twelve of our report, most of the text messages raising such questions pertained to the Russia investigation, which was not a part of this review. Nonetheless, the suggestion in certain Russia-related text messages in August 2016 that Strzok might be willing to take official action to impact presidential candidate Trump's electoral prospects caused us to question the earlier Midyear investigative decisions in which Strzok was involved, and whether he took specific actions in the Midyear investigation based on his political views. As we describe Chapter Five of our report, we found that Strzok was not the sole decisionmaker for any of the specific Midyear investigative decisions we examined in that chapter. We further found evidence that in some instances Strzok and Page advocated for more aggressive investigative measures in the Midyear investigation,

such as the use of grand jury subpoenas and search warrants to obtain evidence.

There were clearly tensions and disagreements in a number of important areas between Midyear agents and prosecutors. However, we did not find documentary or testimonial evidence that improper considerations, including political bias, directly affected the specific investigative decisions we reviewed in Chapter Five, or that the justifications offered for these decisions were pretextual.

Nonetheless, these messages cast a cloud over the FBI's handling of the Midyear investigation and the investigation's credibility. But our review did not find evidence to connect the political views expressed in these messages to the specific investigative decisions that we reviewed; rather, consistent with the analytic approach described above, we found that these specific decisions were the result of discretionary judgments made during the course of an investigation by the Midyear agents and prosecutors and that these judgment calls were not unreasonable. The broader impact of these text and instant messages, including on such matters as the public perception of the FBI and the Midyear investigation, are discussed in Chapter Twelve of our report.

## Comey's Public Statement on July 5

*"Endgame" Discussions*

As we describe in Chapter Six of the report, by the Spring of 2016, Comey and the Midyear team had determined that, absent an unexpected development, evidence to support a criminal prosecution of Clinton was lacking. Midyear team members told us that they based this assessment on a lack of evidence showing intent to place classified information on the server, or knowledge that the information was classified. We describe the factors that the Department took into account in its decision to decline prosecution in Chapter Seven of our report and below.

Comey told the OIG that as he began to realize the investigation was likely to result in a declination, he began to think of ways to credibly announce its closing. Comey engaged then DAG Yates in discussions in April 2016 about the "endgame" for the Midyear investigation. Comey said that he encouraged Yates to consider the most transparent options for announcing a declination. Yates told the OIG that, as a result of her



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

discussions with Comey, she thought the Department and FBI would jointly announce any declination.

Comey said he also told Yates that the closer they got to the political conventions, the more likely he would be to insist that a special counsel be appointed, because he did not believe the Department could credibly announce the closing of the investigation once Clinton was the Democratic Party nominee.  However, we did not find evidence that Comey ever seriously considered requesting a special counsel; instead, he used the reference to a special counsel as an effort to induce the Department to move more quickly to obtain the Mills and Samuelson culling laptops and to complete the investigation.

Although Comey engaged with the Department in these "endgame" discussions, he told us that he was concerned that involvement by then AG Loretta Lynch in a declination announcement would result in "corrosive doubt" about whether the decision was objective and impartial because Lynch was appointed by a President from the same political party as Clinton.  Comey cited other factors to us that he said caused him to be concerned by early May 2016 that Lynch could not credibly participate in announcing a declination:

- An alleged instruction from Lynch at a meeting in September 2015 to call the Midyear investigation a "matter" in statements to the media and Congress, which we describe in Chapter Four of our report;

- Statements made by then President Barack Obama about the Midyear investigation, which also are discussed in Chapter Four; and

- Concerns that certain classified information mentioning Lynch would leak, which we describe in Chapter Six and in the classified appendix.

As we discuss below and in Chapter Six of our report, the meeting between Lynch and former President Clinton on June 27, 2016 also played a role in Comey's decision to deliver a unilateral statement.

Comey did not raise any of these concerns with Lynch or Yates.  Rather, unbeknownst to them, Comey began considering the possibility of an FBI-only public statement in late April and early May 2016.  Comey told the OIG that a separate public statement was warranted by the "500-year flood" in which the FBI found itself, and that he weighed the need to preserve the credibility and integrity of the Department and the

FBI, and the need to protect "a sense of justice more broadly in the country—that things are fair not fixed, and they're done independently."

*Comey's Draft Statement*

Comey's initial draft statement, which he shared with FBI senior leadership on May 2, criticized Clinton's handling of classified information as "grossly negligent," but concluded that "no reasonable prosecutor" would bring a case based on the facts developed in the Midyear investigation.  Over the course of the next 2 months, Comey's draft statement underwent various language changes, including the following:

- The description of Clinton's handling of classified information was changed from "grossly negligent" to "extremely careless;"

- A statement that the sheer volume of information classified as Secret supported an inference of gross negligence was removed and replaced with a statement that the classified information they discovered was "especially concerning because all of these emails were housed on servers not supported by full-time staff";

- A statement that the FBI assessed that it was "reasonably likely" that hostile actors gained access to Clinton's private email server was changed to "possible."  The statement also acknowledged that the FBI investigation and its forensic analysis did not find evidence that Clinton's email server systems were compromised; and

- A paragraph summarizing the factors that led the FBI to assess that it was possible that hostile actors accessed Clinton's server was added, and at one point referenced Clinton's use of her private email for an exchange with then President Obama while in the territory of a foreign adversary.  This reference later was changed to "another senior government official," and ultimately was omitted.

Each version of the statement criticized Clinton's handling of classified information.  Comey told us that he included criticism of former Secretary Clinton's uncharged conduct because "unusual transparency...was necessary for an unprecedented situation," and that such transparency "was the best chance we had of having the American people have confidence that the justice system works[.]"



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

Other witnesses told the OIG that Comey included this criticism to avoid creating the appearance that the FBI was "letting [Clinton] off the hook," as well as to "messag[e]" the decision to the FBI workforce to emphasize that employees would be disciplined for similar conduct and to distinguish the Clinton investigation from the cases of other public figures who had been prosecuted for mishandling violations.

*The Tarmac Meeting and Impact on Comey's Statement*

On June 27, 2016, Lynch met with former President Clinton on Lynch's plane, which was parked on the tarmac at a Phoenix airport. This meeting was unplanned, and Lynch's staff told the OIG they received no notice that former President Clinton planned to board Lynch's plane. Both Lynch and former President Clinton told the OIG that they did not discuss the Midyear investigation or any other Department investigation during their conversation. Chapter Six of our report describes their testimony about the substance of their discussion.

Lynch told the OIG that she became increasingly concerned as the meeting "went on and on," and stated "that it was just too long a conversation to have had." Following this meeting, Lynch obtained an ethics opinion from the Departmental Ethics Office that she was not required to recuse herself from the Midyear investigation, and she decided not to voluntarily recuse herself either. In making this decision, Lynch told the OIG that stepping aside would create a misimpression that she and former President Clinton had discussed inappropriate topics, or that her role in the Midyear investigation somehow was greater than it was.

On July 1, during an interview with a reporter, Lynch stated that she was not recusing from the Midyear investigation, but that she "fully expect[ed]" to accept the recommendation of the career agents and prosecutors who conducted the investigation, "as is the common process." Then, in a follow up question, Lynch said "I'll be briefed on [the findings] and I will be accepting their recommendations." Lynch's statements created considerable public confusion about the status of her continuing involvement in the Midyear investigation.

Although we found no evidence that Lynch and former President Clinton discussed the Midyear investigation or engaged in other inappropriate discussions during their tarmac meeting, we also found that Lynch's failure to recognize the appearance problem created by former President Clinton's visit and to take action to cut the

visit short was an error in judgment. We further concluded that her efforts to respond to the meeting by explaining what her role would be in the investigation going forward created public confusion and did not adequately address the situation.

Comey told the OIG that he was "90 percent there, like highly likely" to make a separate public statement prior to the tarmac meeting, but that the tarmac meeting "tipped the scales" toward making his mind up to go forward with his own public statement.

*Comey's Decision Not to Tell Department Leadership*

Comey acknowledged that he made a conscious decision not to tell Department leadership about his plans to make a separate statement because he was concerned that they would instruct him not to do it. He also acknowledged that he made this decision when he first conceived of the idea to do the statement, even as he continued to engage the Department in discussions about the "endgame" for the investigation.

Comey admitted that he concealed his intentions from the Department until the morning of his press conference on July 5, and instructed his staff to do the same, to make it impracticable for Department leadership to prevent him from delivering his statement. We found that it was extraordinary and insubordinate for Comey to do so, and we found none of his reasons to be a persuasive basis for deviating from well-established Department policies in a way intentionally designed to avoid supervision by Department leadership over his actions.

On the morning of July 5, 2016, Comey contacted Lynch and Yates about his plans to make a public statement, but did so only after the FBI had notified the press—in fact, the Department first learned about Comey's press conference from a media inquiry, rather than from the FBI. When Comey did call Lynch that morning, he told her that he was not going to inform her about the substance of his planned press statement.

While Lynch asked Comey what the subject matter of the statement was going to be (Comey told her in response it would be about the Midyear investigation), she did not ask him to tell her what he intended to say about the Midyear investigation. We found that Lynch, having decided not to recuse herself, retained authority over both the final prosecution decision and the Department's management of the Midyear investigation. As such, we believe she should have instructed Comey



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

to tell her what he intended to say beforehand, and should have discussed it with Comey.

Comey's public statement announced that the FBI had completed its Midyear investigation, criticized Clinton and her senior aides as "extremely careless" in their handling of classified information, stated that the FBI was recommending that the Department decline prosecution of Clinton, and asserted that "no reasonable prosecutor" would prosecute Clinton based on the facts developed by the FBI during its investigation. We determined that Comey's decision to make this statement was the result of his belief that only he had the ability to credibly and authoritatively convey the rationale for the decision to not seek charges against Clinton, and that he needed to hold the press conference to protect the FBI and the Department from the extraordinary harm that he believed would have resulted had he failed to do so. While we found no evidence that Comey's statement was the result of bias or an effort to influence the election, we did not find his justifications for issuing the statement to be reasonable or persuasive.

We concluded that Comey's unilateral announcement was inconsistent with Department policy and violated long-standing Department practice and protocol by, among other things, criticizing Clinton's uncharged conduct. We also found that Comey usurped the authority of the Attorney General, and inadequately and incompletely described the legal position of Department prosecutors.

## The Department's Declination Decision on July 6

Following Comey's public statement on July 5, the Midyear prosecutors finalized their recommendation that the Department decline prosecution of Clinton, her senior aides, and the senders of emails determined to contain classified information. On July 6, the Midyear prosecutors briefed Lynch, Yates, Comey, other members of Department and FBI leadership, and FBI Midyear team members about the basis for the declination recommendation. Lynch subsequently issued a short public statement that she met with the career prosecutors and agents who conducted the investigation and "received and accepted their unanimous recommendation" that the investigation be closed without charges.

We found that the prosecutors considered five federal statutes:

- 18 U.S.C. §§ 793(d) and (e) (willful mishandling of documents or information relating to the national defense);

- 18 U.S.C. § 793(f) (removal, loss, theft, abstraction, or destruction of documents or information relating to the national defense through gross negligence, or failure to report such removal, loss, theft, abstraction, or destruction);

- 18 U.S.C. § 1924 (unauthorized removal and retention of classified documents or material by government employees); and

- 18 U.S.C. § 2071 (concealment, removal, or mutilation of government records).

As described in Chapter Seven of our report, the prosecutors concluded that the evidence did not support prosecution under any of these statutes for various reasons, including that former Secretary Clinton and her senior aides lacked the intent to communicate classified information on unclassified systems. Critical to their conclusion was that the emails in question lacked proper classification markings, that the senders often refrained from using specific classified facts or terms in emails and worded emails carefully in an attempt to "talk around" classified information, that the emails were sent to other government officials in furtherance of their official duties, and that former Secretary Clinton relied on the judgment of State Department employees to properly handle classified information, among other facts.

We further found that the statute that required the most complex analysis by the prosecutors was Section 793(f)(1), the "gross negligence" provision that has been the focus of much of the criticism of the declination decision. As we describe in Chapters Two and Seven of our report, the prosecutors analyzed the legislative history of Section 793(f)(1), relevant case law, and the Department's prior interpretation of the statute. They concluded that Section 793(f)(1) likely required a state of mind that was "so gross as to almost suggest deliberate intention," criminally reckless, or "something that falls just short of being willful," as well as evidence that the individuals who sent emails containing classified information "knowingly" included or transferred such information onto unclassified systems.

The Midyear team concluded that such proof was lacking. We found that this interpretation of Section 793(f)(1) was consistent with the Department's historical approach in prior cases under different leadership, including in the 2008 decision not to



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

prosecute former Attorney General Alberto Gonzales for mishandling classified documents.

We analyzed the Department's declination decision according to the same analytical standard that we applied to other decisions made during the investigation. We did not substitute the OIG's judgment for the judgments made by the Department, but rather sought to determine whether the decision was based on improper considerations, including political bias. We found no evidence that the conclusions by the prosecutors were affected by bias or other improper considerations; rather, we determined that they were based on the prosecutors' assessment of the facts, the law, and past Department practice.

We therefore concluded that these were legal and policy judgments involving core prosecutorial discretion that were for the Department to make.

## Discovery in September 2016 of Emails on the Weiner Laptop

### Discovery of Emails by the FBI's New York Field Office

In September 2016, the FBI's New York Field Office (NYO) and the U.S. Attorney's Office for the Southern District of New York (SDNY) began investigating former Congressman Anthony Weiner for his online relationship with a minor. A federal search warrant was obtained on September 26, 2016, for Weiner's iPhone, iPad, and laptop computer. The FBI obtained these devices the same day. The search warrant authorized the government to search for evidence relating to the following crimes: transmitting obscene material to a minor, sexual exploitation of children, and activities related to child pornography.

The Weiner case agent told the OIG that he began processing Weiner's devices on September 26, and that he noticed "within hours" that there were "over 300,000 emails on the laptop." He said that either that evening or the next morning, he saw at least one BlackBerry PIN message between Clinton and Abedin, as well as emails between them. He said that he recalled seeing emails associated with "about seven domains," such as yahoo.com, state.gov, clintonfoundation.org, clintonemail.com, and hillaryclinton.com. The case agent immediately notified his NYO chain of command, and the information was ultimately briefed to NYO Assistant Director in Charge (ADIC) William Sweeney on September 28.

### Reporting of Emails to FBI Headquarters

As we describe in Chapter Nine of our report, Sweeney took the following steps to notify FBI Headquarters about the discovery of Midyear-related emails on the Weiner laptop:

- On September 28, during a secure video teleconference (SVTC), Sweeney reported that Weiner investigation agents had discovered 141,000 emails on Weiner's laptop that were potentially relevant to the Midyear investigation. The OIG determined that this SVTC was led by then Deputy Director Andrew McCabe, and that approximately 39 senior FBI executives likely would have participated. Comey was not present for the SVTC.

- Sweeney said he spoke again with McCabe on the evening of September 28. Sweeney said that during this call he informed McCabe that NYO personnel had continued processing the laptop and that they had now identified 347,000 emails on the laptop.

- Sweeney said he also called two FBI Executive Assistant Directors (EAD) on September 28 and informed them that the Weiner case team had discovered emails relevant to the Midyear investigation. One of the EADs told the OIG that he then called McCabe, and that McCabe told the EAD that he was aware of the emails. The EAD told us that "[T]here was no doubt in my mind when we finished that conversation that [McCabe] understood the, the gravity of what the find was."

- Sweeney said he also spoke to FBI Assistant Director E.W. "Bill" Priestap on September 28 and 29, 2016. Emails indicate that during their conversation on September 29, they discussed the limited scope of the Weiner search warrant (*i.e.*, the need to obtain additional legal process to review any Midyear-related email on the Weiner laptop).

### Initial Response of FBI Headquarters

McCabe told the OIG that he considered the information provided by Sweeney to be "a big deal" and said he instructed Priestap to send a team to New York to review the emails on the Weiner laptop. McCabe told the OIG that he recalled talking to Comey about the issue "right around the time [McCabe] found out about it." McCabe described it as a "fly-by," where the Weiner



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

laptop was "like one in a list of things that we discussed."

Comey said that he recalled first learning about the additional emails on the Weiner laptop at some point in early October 2016, although he said it was possible this could have occurred in late September 2016. Comey told the OIG that this information "didn't index" with him, which he attributed to the way the information was presented to him and the fact that, "I don't know that I knew that [Weiner] was married to Huma Abedin at the time."

Text messages of FBI Deputy Assistant Director Peter Strzok indicated that he, McCabe, and Priestap discussed the Weiner laptop on September 28. Strzok said that he had initially planned to send a team to New York to review the emails, but a conference call with NYO was scheduled instead. The conference call took place on September 29, and five members of the FBI Midyear team participated. Notes from the conference call indicate the participants discussed the presence of a large volume of emails (350,000) on the Weiner laptop and specific domain names, including clintonemail.com and state.gov. The Midyear SSA said that NYO also mentioned seeing BlackBerry domain emails on the Weiner laptop.

Additional discussions took place on October 3 and 4, 2016. However, after October 4, we found no evidence that anyone associated with the Midyear investigation, including the entire leadership team at FBI Headquarters, took any action on the Weiner laptop issue until the week of October 24, and then did so only after the Weiner case agent expressed concerns to SDNY, prompting SDNY to contact the Office of the Deputy Attorney General (ODAG) on October 21 to raise concerns about the lack of action.

*Reengagement of FBI Headquarters*

On Friday, October 21, SDNY Deputy U.S. Attorney Joon Kim contacted ODAG and was put in touch with DAAG George Toscas, the most senior career Department official involved in the Midyear investigation. Thereafter, at Toscas's request, one of the Midyear prosecutors called Strzok. This was the first conversation that the FBI had with Midyear prosecutors about the Weiner laptop.

Toscas said he asked McCabe about the Weiner laptop on Monday, October 24, after a routine meeting between FBI and Department leadership. McCabe told us that this interaction with Toscas caused him to follow up with the FBI Midyear team about the Weiner laptop and to call McCord about the issue.

On October 26, NYO, SDNY, and Midyear team members participated in a conference call. The FBI Midyear team told the OIG that they learned important new information on this call, specifically: (1) that there was a large volume of emails on the Weiner laptop, particularly the potential for a large number of @clintonemail.com emails; and (2) that the presence of Blackberry data indicated that emails from Clinton's first three months as Secretary of State could be present on the laptop. However, as we describe above and in Chapter Nine of our report, these basic facts were known to the FBI by September 29, 2016.

The FBI Midyear team briefed McCabe about the information from the conference call on the evening of October 26, 2016. McCabe told us that he felt the situation was "absolutely urgent" and proposed that the FBI Midyear team meet with Comey the following day.

On October 27 at 5:20 a.m., McCabe emailed Comey stating that the Midyear team "has come across some additional actions they believe they need to take," and recommending that they meet that day to discuss the implications "if you have any space on your calendar." Comey stated that he did not know what this email was about when he received it and did not initially recall that he had been previously notified about the Weiner laptop.

We found that, by no later than September 29, FBI executives and the FBI Midyear team had learned virtually every fact that was cited by the FBI in late October as justification for obtaining the search warrant for the Weiner laptop, including that the laptop contained:

- Over 340,000 emails, some of which were from domains associated with Clinton, including state.gov, clintonfoundation.org, clintonemail.com, and hillaryclinton.com;

- Numerous emails between Clinton and Abedin;

- An unknown number of Blackberry communications on the laptop, including one or more messages between Clinton and Abedin, indicating the possibility that the laptop contained communications from the early months of Clinton's tenure; and

- Emails dated beginning in 2007 and covering the entire period of Clinton's tenure as Secretary of State.



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

As we describe in Chapter Nine of our report, the explanations we were given for the FBI's failure to take immediate action on the Weiner laptop fell into four general categories:

- The FBI Midyear team was waiting for additional information about the contents of the laptop from NYO, which was not provided until late October;

- The FBI Midyear team could not review the emails without additional legal authority, such as consent or a new search warrant;

- The FBI Midyear team and senior FBI officials did not believe that the information on the laptop was likely to be significant; and

- Key members of the FBI Midyear team had been reassigned to the investigation of Russian interference in the U.S. election, which was a higher priority.

We found these explanations to be unpersuasive justifications for not acting sooner, given the FBI leadership's conclusion about the importance of the information and that the FBI Midyear team had sufficient information to take action in early October and knew at that time that it would need a new search warrant to review any Clinton-Abedin emails. Moreover, given the FBI's extensive resources, the fact that Strzok and several other FBI members of the Midyear team had been assigned to the Russia investigation, which was extremely active during this September and October time period, was not an excuse for failing to take any action during this time period on the Weiner laptop.

The FBI's failure to act in late September or early October is even less justifiable when contrasted with the attention and resources that FBI management and some members of the Midyear team dedicated to other activities in connection with the Midyear investigation during the same period. As detailed in Chapter Eight, these activities included:

- The preparation of Comey's speech at the FBI's SAC Conference on October 12, a speech designed to help equip SACs to "bat down" misinformation about the July 5 declination decision;

- The preparation and distribution of detailed talking points to FBI SACs in mid-October in order, again, "to equip people who are going to be talking about it anyway with the actual facts

and [the FBI's] actual perspective on [the declination]"; and

- A briefing for retired FBI agents conducted on October 21 to describe the investigative decisions made during Midyear so as to arm former employees with facts so that they, too, might counter "falsehoods and exaggerations."

In assessing the decision to prioritize the Russia investigation over following up on the Midyear-related investigative lead discovered on the Weiner laptop, we were particularly concerned about text messages sent by Strzok and Page that potentially indicated or created the appearance that investigative decisions they made were impacted by bias or improper considerations. Most of the text messages raising such questions pertained to the Russia investigation, and the implication in some of these text messages, particularly Strzok's August 8 text message ("we'll stop" candidate Trump from being elected), was that Strzok might be willing to take official action to impact a presidential candidate's electoral prospects. Under these circumstances, we did not have confidence that Strzok's decision to prioritize the Russia investigation over following up on the Midyear-related investigative lead discovered on the Weiner laptop was free from bias.

We searched for evidence that the Weiner laptop was deliberately placed on the back-burner by others in the FBI to protect Clinton, but found no evidence in emails, text messages, instant messages, or documents that suggested an improper purpose. We also took note of the fact that numerous other FBI executives—including the approximately 39 who participated in the September 28 SVTC—were briefed on the potential existence of Midyear-related emails on the Weiner laptop. We also noted that the Russia investigation was under the supervision of Priestap—for whom we found no evidence of bias and who himself was aware of the Weiner laptop issue by September 29. However, we also did not identify a consistent or persuasive explanation for the FBI's failure to act for almost a month after learning of potential Midyear-related emails on the Weiner laptop.

The FBI's inaction had potentially far-reaching consequences. Comey told the OIG that, had he known about the laptop in the beginning of October and thought the email review could have been completed before the election, it may have affected his decision to notify Congress. Comey told the OIG, "I don't know [if] it would have put us in a different place, but I would have wanted to have the opportunity."



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

## Comey's Decision to Notify Congress on October 28

Following the briefing from the FBI Midyear team on October 27, 2016, Comey authorized the Midyear team to seek a search warrant, telling the OIG that "the volume of emails" and the presence of BlackBerry emails on the Weiner laptop were "two highly significant facts." As we describe in Chapter Thirteen of our report, McCabe joined this meeting by phone but was asked not to participate, and subsequently recused himself from the Midyear investigation on November 1, 2016.

The issue of notifying Congress of the Weiner laptop development was first raised at the October 27 briefing and, over the course of the next 24 hours, numerous additional discussions occurred within the FBI. As we describe in Chapter Ten of our report, the factors considered during those discussions included:

- Comey's belief that failure to disclose the existence of the emails would be an act of concealment;

- The belief that Comey had an obligation to update Congress because the discovery was potentially significant and made his prior testimony that the investigation was closed no longer true;

- An implicit assumption that Clinton would be elected President;

- Fear that the information would leak if the FBI failed to disclose it;

- Concern that failing to disclose would result in accusations that the FBI had "engineered a cover up" to help Clinton get elected;

- Concerns about protecting the reputation of the FBI;

- Concerns about the perceived illegitimacy of a Clinton presidency that would follow from a failure to disclose the discovery of the emails if they proved to be significant;

- Concerns about the electoral impact of any announcement; and

- The belief that the email review could not be completed before the election.

As a result of these discussions on October 27, Comey decided to notify Congress about the discovery of Midyear-related emails on the Weiner laptop. Comey told us that, although he "believe[d] very strongly that our rule should be, we don't comment on pending investigations" and that it was a "very important norm" for the Department to avoid taking actions that could impact an imminent election, he felt he had an obligation to update Congress because the email discovery was potentially very significant and it made his prior testimony no longer true.

We found no evidence that Comey's decision to send the October 28 letter was influenced by political preferences. Instead, we found that his decision was the result of several interrelated factors that were connected to his concern that failing to send the letter would harm the FBI and his ability to lead it, and his view that candidate Clinton was going to win the presidency and that she would be perceived to be an illegitimate president if the public first learned of the information after the election. Although Comey told us that he "didn't make this decision because [he] thought it would leak otherwise," several FBI officials told us that the concern about leaks played a role in the decision.

Much like with his July 5 announcement, we found that in making this decision, Comey engaged in ad hoc decisionmaking based on his personal views even if it meant rejecting longstanding Department policy or practice. We found unpersuasive Comey's explanation as to why transparency was more important than Department policy and practice with regard to the reactivated Midyear investigation while, by contrast, Department policy and practice were more important to follow with regard to the Clinton Foundation and Russia investigations.

Comey's description of his choice as being between "two doors," one labeled "speak" and one labeled "conceal," was a false dichotomy. The two doors were actually labeled "follow policy/practice" and "depart from policy/practice." Although we acknowledge that Comey faced a difficult situation with unattractive choices, in proceeding as he did, we concluded that Comey made a serious error of judgment.

*Department and FBI Leadership Discussions*

On October 27, Comey instructed his Chief of Staff, James Rybicki, to reach out to the Department about his plan to notify Congress. As we describe in Chapter Ten of our report, Comey told the OIG that he decided to ask Rybicki to inform the Department rather than to contact Lynch or Yates directly because he did not "want to jam them and I wanted to offer them the



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

opportunity to think about and decide whether they wanted to be engaged on it." Rybicki and Axelrod spoke on the afternoon of October 27 and had "a series of phone calls" the rest of the day. Rybicki told Axelrod that Comey believed he had an obligation to notify Congress about the laptop in order to correct a misimpression that the Midyear investigation was closed.

Lynch, Yates, Axelrod, and their staffs had several discussions that same day as to whether Lynch or Yates should call Comey directly, but said they ultimately decided to have Axelrod communicate "the strong view that neither the DAG nor [AG] felt this letter should go out." Yates told us they were concerned that direct contact with Comey would be perceived as "strong-arming" him, and that based on her experience with Comey, he was likely to "push back hard" against input from Lynch or her, especially if accepting their input meant that he had to go back to his staff and explain that he was reversing his decision. She said that she viewed Rybicki as the person they needed to convince if they wanted to change Comey's mind. Accordingly, Axelrod informed Rybicki on October 27 of the Department's strong opposition to Comey's plan to send a letter.

Rybicki reported to Comey that the Department "recommend[ed] against" the Congressional notification and thought it was "a bad idea." Although Comey told us that he would not have sent the letter if Lynch or Yates had told him not to do so, he said he viewed their response as only a recommendation and interpreted their lack of direct engagement as saying "basically...it's up to you.... I honestly thought they were taking kind of a cowardly way out." The following day, October 28, Comey sent a letter to Congress stating, in part, that "the FBI has learned of the existence of emails that appear to be pertinent to the [Midyear] investigation."

Comey, Lynch, and Yates faced difficult choices in late October 2016. However, we found it extraordinary that Comey assessed that it was best that the FBI Director not speak directly with the Attorney General and Deputy Attorney General about how best to navigate this most important decision and mitigate the resulting harms, and that Comey's decision resulted in the Attorney General and Deputy Attorney General concluding that it would be counterproductive to speak directly with the FBI Director. We believe that open and candid communication among leaders in the Department and its components is essential for the effective functioning of the Department.

## Text and Instant Messages, Use of Personal Email, and Alleged Improper Disclosures of Non-Public Information

*Text Messages and Instant Messages*

As we describe in Chapter Twelve, during our review we identified text messages and instant messages sent on FBI mobile devices or computer systems by five FBI employees who were assigned to the Midyear investigation. These included:

- Text messages exchanged between Strzok and Page;

- Instant messages exchanged between Agent 1, who was one of the four Midyear case agents, and Agent 5, who was a member of the filter team; and

- Instant messages sent by FBI Attorney 2, who was assigned to the Midyear investigation.

The text messages and instant messages sent by these employees included statements of hostility toward then candidate Trump and statements of support for candidate Clinton, and several appeared to mix political opinions with discussions about the Midyear investigation.

We found that the conduct of these five FBI employees brought discredit to themselves, sowed doubt about the FBI's handling of the Midyear investigation, and impacted the reputation of the FBI. Although our review did not find documentary or testimonial evidence directly connecting the political views these employees expressed in their text messages and instant messages to the specific investigative decisions we reviewed in Chapter Five, the conduct by these employees cast a cloud over the FBI Midyear investigation and sowed doubt the FBI's work on, and its handling of, the Midyear investigation. Moreover, the damage caused by their actions extends far beyond the scope of the Midyear investigation and goes to the heart of the FBI's reputation for neutral factfinding and political independence.

We were deeply troubled by text messages exchanged between Strzok and Page that potentially indicated or created the appearance that investigative decisions were impacted by bias or improper considerations. Most of the text messages raising such questions pertained to the Russia investigation, which was not a part of this review. Nonetheless, when one senior FBI official, Strzok, who was helping to lead the Russia



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

investigation at the time, conveys in a text message to another senior FBI official, Page, "No. No he won't. We'll stop it" in response to her question "[Trump's] not ever going to become president, right? Right?!", it is not only indicative of a biased state of mind but, even more seriously, implies a willingness to take official action to impact the presidential candidate's electoral prospects. This is antithetical to the core values of the FBI and the Department of Justice.

We do not question that the FBI employees who sent these messages are entitled to their own political views. However, we believe using FBI devices to send the messages discussed in Chapter Twelve—particularly the messages that intermix work-related discussions with political commentary—potentially implicate provisions in the FBI's Offense Code and Penalty Guidelines. At a minimum, we found that the employees' use of FBI systems and devices to send the identified messages demonstrated extremely poor judgment and a gross lack of professionalism. We therefore refer this information to the FBI for its handling and consideration of whether the messages sent by the five employees listed above violated the FBI's Offense Code of Conduct.

*Use of Personal Email*

As we also describe in Chapter Twelve, we learned during the course of our review that Comey, Strzok, and Page used their personal email accounts to conduct FBI business.

We identified numerous instances in which Comey used a personal email account to conduct unclassified FBI business. We found that, given the absence of exigent circumstances and the frequency with which the use of personal email occurred, Comey's use of a personal email account for unclassified FBI business to be inconsistent with Department policy.

We found that Strzok used his personal email accounts for official government business on several occasions, including forwarding an email from his FBI account to his personal email account about the proposed search warrant the Midyear team was seeking on the Weiner laptop. This email included a draft of the search warrant affidavit, which contained information from the Weiner investigation that appears to have been under seal at the time in the Southern District of New York and information obtained pursuant to a grand jury subpoena issued in the Eastern District of Virginia in the Midyear investigation. We refer to the FBI the issue of whether Strzok's use of personal email accounts violated FBI and Department policies.

Finally, when questioned, Page also told us she used personal email for work-related matters at times. She stated that she and Strzok sometimes used these forums for work-related discussions due to the technical limitations of FBI-issued phones. Page left the FBI on May 4, 2018.

*Improper Disclosure of Non-Public Information*

As we also describe in Chapter Twelve, among the issues we reviewed were allegations that Department and FBI employees improperly disclosed non-public information regarding the Midyear investigation. Although FBI policy strictly limits the employees who are authorized to speak to the media, we found that this policy appeared to be widely ignored during the period we reviewed.

We identified numerous FBI employees, at all levels of the organization and with no official reason to be in contact with the media, who were nevertheless in frequent contact with reporters. Attached to this report as Attachments E and F are two link charts that reflect the volume of communications that we identified between FBI employees and media representatives in April/May and October 2016. We have profound concerns about the volume and extent of unauthorized media contacts by FBI personnel that we have uncovered during our review.

In addition, we identified instances where FBI employees improperly received benefits from reporters, including tickets to sporting events, golfing outings, drinks and meals, and admittance to nonpublic social events. We will separately report on those investigations as they are concluded, consistent with the Inspector General Act, other applicable federal statutes, and OIG policy.

The harm caused by leaks, fear of potential leaks, and a culture of unauthorized media contacts is illustrated in Chapters Ten and Eleven of our report, where we detail the fact that these issues influenced FBI officials who were advising Comey on consequential investigative decisions in October 2016. The FBI updated its media policy in November 2017, restating its strict guidelines concerning media contacts, and identifying who is required to obtain authority before engaging members of the media, and when and where to report media contact. We do not believe the problem is with the FBI's policy, which we found to be clear and unambiguous. Rather, we concluded that these leaks highlight the need to change what appears to be a cultural attitude among many in the organization.



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

## Recusal Issues

**Former Deputy Director Andrew McCabe:** As we describe in Chapter Thirteen, in 2015, McCabe's spouse, Dr. Jill McCabe, ran for a Virginia State Senate seat. During the campaign, Dr. McCabe's campaign committee received substantial monetary and in-kind contributions, totaling $675,288 or approximately 40 percent of the total contributions raised by Dr. McCabe for her state senate campaign, from then Governor McAuliffe's Political Action Committee (PAC) and from the Virginia Democratic Party. In addition, on June 26, 2015, Hillary Clinton was the featured speaker at a fundraiser in Virginia hosted by the Virginia Democratic Party and attended by Governor McAuliffe.

At the time his wife sought to run for state senate, McCabe was the Assistant Director in Charge of the FBI's Washington Field Office (WFO) and sought ethics advice from FBI ethics officials and attorneys. We found that FBI ethics officials and attorneys did not fully appreciate the potential significant implications to McCabe and the FBI from campaign donations to Dr. McCabe's campaign. The FBI did not implement any review of campaign donations to assess potential conflicts or appearance issues that could arise from the donations. On this issue, we believe McCabe did what he was supposed to do by notifying those responsible in the FBI for ethics issues and seeking their guidance.

After McCabe became FBI Deputy Director in February 2016, McCabe had an active role in the supervision of the Midyear investigation, and oversight of the Clinton Foundation investigation, until he recused himself from these investigations on November 1, 2016. McCabe voluntarily recused himself on November 1, at Comey's urging, as the result of an October 23 article in the Wall Street Journal identifying the substantial donations from McAuliffe's PAC and the Virginia Democratic Party to Dr. McCabe.

With respect to these investigations, we agreed with the FBI's chief ethics official that McCabe was not at any time required to recuse under the relevant authorities. However, voluntary recusal is always permissible with the approval of a supervisor or ethics official, which is what McCabe did on November 1. Had the FBI put in place a system for reviewing campaign donations to Dr. McCabe, which were public under Virginia law, the sizable donations from McAuliffe's PAC and the Virginia Democratic Party may have triggered prior consideration of the very appearance concerns raised in the October 23 WSJ article. Finally, we also found that McCabe did not fully comply with this recusal in a few

instances related to the Clinton Foundation investigation.

**Former Assistant Attorney General Peter Kadzik:** In Chapter Fourteen, we found that Kadzik demonstrated poor judgment by failing to recuse himself from Clinton-related matters under federal ethics regulations prior to November 2, 2016. Kadzik did not recognize the appearance of a conflict that he created when he initiated an effort to obtain employment for his son with the Clinton campaign while participating in Department discussions and communications about Clinton-related matters.

Kadzik also created an appearance of a conflict when he sent the Chairman of the Clinton Campaign and a longtime friend, John Podesta, the "Heads up" email that included the schedule for the release of former Secretary Clinton's emails proposed to the court in a FOIA litigation without knowing whether the information had yet been filed and made public. His willingness to do so raised a reasonable question about his ability to act impartially on Clinton-related matters in connection with his official duties.

Additionally, although Department leadership determined that Kadzik should be recused from Clinton-related matters upon learning of his "Heads up" email to Podesta, we found that Kadzik failed to strictly adhere to this recusal. Lastly, because the government information in the "Heads up" email had in fact been released publically, we did not find that Kadzik released non-public information or misused his official position.

## FBI Records Vault Twitter Announcements

As we describe in Chapter Fifteen, on November 1, 2016, in response to multiple FOIA requests, the FBI Records Management Division (RMD) posted records to the FBI Records Vault, a page on the FBI's public website, concerning the "William J. Clinton Foundation." The @FBIRecordsVault Twitter account announced this posting later the same day. We concluded that these requests were processed according to RMD's internal procedures like other similarly-sized requests, and found no evidence that the FOIA response was expedited or delayed in order to impact the 2016 presidential election. We also found no evidence that improper political considerations influenced the FBI's use of the Twitter account to publicize the release.



# Executive Summary

*A Review of Various Actions by the Federal Bureau of Investigation and Department of Justice in Advance of the 2016 Election*

## Recommendations

Our report makes nine recommendations to the Department and the FBI to assist them in addressing the issues that we identified in this review:

- We recommend that the Department and the FBI consider developing guidance that identifies the risks associated with and alternatives to permitting a witness to attend a voluntary interview of another witness (including in the witness's capacity as counsel).

- We recommend that the Department consider making explicit that, except in situations where the law requires or permits disclosure, an investigating agency cannot publicly announce its recommended charging decision prior to consulting with the Attorney General, Deputy Attorney General, U.S. Attorney, or his or her designee, and cannot proceed without the approval of one of these officials.

- We recommend that the Department and the FBI consider adopting a policy addressing the appropriateness of Department employees discussing the conduct of uncharged individuals in public statements.

- We recommend that the Department consider providing guidance to agents and prosecutors concerning the taking of overt investigative steps, indictments, public announcements, or other actions that could impact an election.

- We recommend that the Office of the Deputy Attorney General take steps to improve the retention and monitoring of text messages Department-wide.

- We recommend that the FBI add a warning banner to all of the FBI's mobile phones and devices in order to further notify users that they have no reasonable expectation of privacy.

- We recommend that the FBI consider (a) assessing whether it has provided adequate training to employees about the proper use of text messages and instant messages, including any related discovery obligations, and (b) providing additional guidance about the allowable uses of FBI devices for any non-governmental purpose, including guidance about the use of FBI devices for political conversations.

- We recommend that the FBI consider whether (a) it is appropriately educating employees about both its media contact policy and the Department's ethics rules pertaining to the acceptance of gifts, and (b) its disciplinary provisions and penalties are sufficient to deter such improper conduct.

- We recommend that Department ethics officials include the review of campaign donations for possible conflict issues when Department employees or their spouses run for public office.